1 | ISMAIL J. RAMSEY (CABN 189820)
United States Attorney

2

3 | MARTHA BOERSCH (CABN 126569)
Chief, Criminal Division

4 | JARED S. BUSZIN (NYBN 5285838)
Assistant United States Attorney

5

6 |   450 Golden Gate Avenue, Box 36055
  San Francisco, California 94102-3495

7 |   Telephone: (415) 436-7199
  FAX: (415) 436-7234

8 |   Jared.Buszin@usdoj.gov

9 | Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. 24-CR-003 AMO |
| Plaintiff, | UNITED STATES' SENTENCING MEMORANDUM |
| v. | |
| ALEJANDRO LOPEZ, | Hearing Date:  April 30, 2024<br>Time:  2:00 p.m.<br>Court:  Hon. Araceli Martínez-Olguín |
| Defendant. | |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................1

RELEVANT BACKGROUND ...........................................................................................2

    A.    The Offense and Relevant Conduct ....................................................2

    B.    Criminal History ..................................................................................7

    C.    Procedural History ...............................................................................7

SENTENCING GUIDELINES CALCULATION ...............................................................8

    A.    The Two-Point Enhancement Under U.S.S.G. §2D1.1(b)(1) Applies ...............................9

    B.    The Defendant Is Not Eligible for Safety Valve or a Zero-Point Offender Reduction ...............................................................11

SENTENCING RECOMMENDATION ...........................................................................14

    A.    Legal Standard ...................................................................................14

    B.    Sentencing Recommendation and 3553(a) Factors............................14

CONCLUSION .................................................................................................................17

# TABLE OF AUTHORITIES

## CASES

*Galloway v. United States*, 2016 U.S. App. LEXIS 24280 (9th Cir. Sep. 16, 2016) ............................................................................................ 14

*United States v. Alaniz*, 69 F.4th 1124 (9th Cir. 2023) ........................... 9

*United States v. Baldon*, 956 F.3d 1115 (9th Cir. 2020) ..................... 9, 10

*United States v. Booker*, 436 F.3d 238 (D.C. Cir. 2006) ......................... 11

*United States v. Carty*, 520 F.3d 984 (9th Cir. 2008) ............................. 14

*United States v. Cazares*, 121 F.3d 1241 (9th Cir. 1997) ....................... 10

*United States v. Ferryman*, 444 F.3d 1183 (9th Cir. 2006) ............... 11, 12

*United States v. Gomez*, 6 F.4th 992 (9th Cir. 2021) ................................ 9

*United States v. Green*, 940 F.3d 1038 (9th Cir. 2019) ............................. 1

*United States v. Kelso*, 942 F.2d 680 (9th Cir. 1991) ............................... 9

*United States v. Marshall*, 2020 WL 5369038 (E.D. Mich. Sept. 8, 2020) ............. 17

*United States v. McBriarty*, 2021 WL 1648479 (D. Conn. Apr. 27, 2021) ............ 17

*United States v. Nelson*, 222 F.3d 545 (9th Cir. 2000) ........................... 11

*United States v. Pettway*, 2021 WL 4188716 (2d Cir. Sept. 15, 2021) ................ 10

*United States v. Restrepo*, 884 F.2d 1294 (9th Cir. 1989) ......................... 9

*United States v. Salazar*, 61 F.4th 723 (9th Cir. 2023) ........................... 13

*United States v. Shrestha*, 86 F.3d 935 (9th Cir. 1996) ........................... 13

*United States v. Smith*, 175 F.3d 1147 (9th Cir. 1999) ........................... 11

*United States v. Tanner*, 389 F. Supp. 3d 684 (N.D. Cal. 2019) ............... 12

*United States v. Zwibel*, 181 F. App'x 238 (3d Cir. 2006) ....................... 10

## STATUTES

18 U.S.C. §3553(f) ........................................................................... 11, 13

## UNITED STATES SENTENCING GUIDELINES

U.S.S.G. § 2D1.1 Appl. Note 11 ............................................................ 9

U.S.S.G. § 2D1.1(b)(1) ...................................................................... 9

U.S.S.G. § 2K2.1 Appl. Note 14 ................................................................................................ 12

U.S.S.G. § 4C1.1(a) ................................................................................................................ 11

U.S.S.G. § 5C1.2 ..................................................................................................................... 11

# INTRODUCTION

The defendant, Alejandro Lopez, began selling drugs in San Francisco by his own estimates no later than December 2021 and continuing until the date of his arrest in January 2023.  During that yearlong course of conduct, the defendant sold two controlled substances—fentanyl and methamphetamine—that have had (and continue to have) a devastating impact on the community and the vulnerable individuals who are addicted to those drugs.  The defendant had access to significant amounts of fentanyl and methamphetamine, and his trafficking activity was very lucrative, as reflected by the thousands of dollars he received in connection with the DEA controlled purchases underlying this case.

When DEA agents arrested the defendant and searched his shared residence, they found multiple firearms in a drawer in the kitchen.  This included a loaded revolver that was readily accessible, as well as two guns wrapped entirely in duct tape.  The firearms were within arm's reach of another kitchen drawer that contained fentanyl and methamphetamine, the two types of drugs the defendant had repeatedly sold to undercover DEA agents.  In pursuit of safety valve and relief from the mandatory minimum five-year sentence he faces, the defendant has disclaimed any connection to these guns.  But, in an apparent attempt to minimize his connection to the residence where the guns were found, the defendant falsely told the government and Probation that he had only been living at the apartment for about three weeks before his arrest.  This assertion simply cannot be reconciled with the record in this case, including the defendant's own recorded statements, which establish that he had been living at the apartment in question for at least six months before his arrest.

This Court is now tasked with correctly calculating the defendant's recommended sentencing range under the Guidelines and then making a "holistic and individualized determination" as to the appropriate sentence under the Guidelines and the factors set forth in 18 U.S.C. § 3553(a).  *United States v. Green*, 940 F.3d 1038, 1043 (9th Cir. 2019).  In accordance with that mandate, and for the reasons set forth below, the government respectfully recommends that the Court (i) find the defendant's Guidelines range to be 135 – 168 months' imprisonment based on a Total Offense Level of 33 and Criminal History Category I, and (ii) sentence the defendant to a 70-month term of imprisonment, to be followed by a four-year term of supervised release.  Such a sentence would be sufficient but not greater than necessary

based on the factors set forth in 18 U.S.C. § 3553(a).

## RELEVANT BACKGROUND

### A.    The Offense and Relevant Conduct

On June 29, 2022, a confidential source working with the Drug Enforcement Administration (DEA) arranged for the purchase of eight ounces of fentanyl from the defendant.  PSR ¶ 6.  The DEA source told the defendant he would be sending another person to buy the fentanyl from the defendant. *Id.*  That person was a DEA agent working in an undercover capacity ("UC-1").  *Id.*  On the evening of June 29, 2022, UC-1 went to 9848 Holly Street in Oakland to meet the defendant.  *Id.*  After arriving at the location, the defendant came out to UC-1's vehicle, entered the car, and told UC-1 to drive away from 9848 Holly Street because he did not want to do the sale by "his house."  *Id.*; Buszin Decl., Ex. A (recording of controlled buy) at 9:09 – 9:35.  After they drove away, the defendant retrieved 241.296 grams of fentanyl, which he described to UC-1 as "strong" and "hard."  PSR ¶ 6.  The defendant sold UC-1 the fentanyl for $2,100.  *Id.*

Approximately three weeks later, on July 19, 2022, the defendant and UC-1 exchanged text messages to coordinate another purchase of fentanyl.  PSR ¶ 7.  In the course of that communication, the defendant sent UC-1 a video showing rainbow-colored fentanyl.  *Id.*  UC-1 told the defendant he wanted to buy another eight ounces of fentanyl and also asked if the defendant could sell him crystal methamphetamine, which the defendant said he could.  *Id.*  The defendant and UC-1 arranged to complete the drug sale on July 21, 2022, and the defendant directed UC-1 to meet him at 9848 Holly Street again.  *Id.* ¶ 8.  UC-1 told the defendant that he wanted to buy eight ounces of fentanyl and five ounces of methamphetamine for $2,800 in total.  *Id.*  When UC-1 arrived at the defendant's residence, the defendant came outside and got in UC-1's car, after which they drove away to conduct the sale.  *Id.* ¶ 9.  The defendant told UC-1 that he did not have the methamphetamine but could sell him twelve ounces of fentanyl.  *Id.* ¶ 9.  In the course of completing the purchase of that fentanyl, UC-1 told the defendant he did not think the fentanyl weighed as much as the defendant said it did.  Buszin Decl., Ex. B (recording of controlled buy) at 11:10 – 12:30.  The defendant then told UC-1 to go back to "my house" where he would check the weight of the fentanyl.  PSR ¶ 9.  UC-1 drove the defendant back to 9848 Holly Street to weigh the fentanyl, after which the defendant returned to the car and sold UC-1 312

grams of fentanyl for $2,700.  *Id.*

About seven weeks after the July 21 controlled buy, UC-1 arranged to purchase another six

ounces of fentanyl from the defendant, along with four ounces of methamphetamine.  *Id.* ¶ 10.  They

arranged to conduct the sale at the same location—9848 Holly Street—on September 8, 2022.  *Id.*  In the

time immediately preceding the scheduled buy, DEA agents conducted surveillance in the vicinity of the

defendant's residence and observed a red BMW 328i arrive at the residence.  *Id.*  Two unknown males

got out of the car and went into the defendant's apartment.  *Id.*  After UC-1 arrived at the residence, the

defendant came outside and got in UC-1's car with the pre-agreed amount of fentanyl and

methamphetamine.  *Id.*  UC-1 told the defendant he wanted four more ounces of methamphetamine, so

the defendant placed a phone call and told UC-1 that someone would bring out the additional

methamphetamine.  *Id.*  A short time later, one of the males who had arrived in the red BMW brought

out the additional methamphetamine.  *Id.*  Ultimately, the defendant sold UC-1 225.1 grams of actual

methamphetamine and 198.1 grams of fentanyl for $2,300 on this date.  *Id.*  Before UC-1 left, he asked

the defendant whether he could sell him counterfeit oxycodone pills.  *Id.*  The defendant said he could,

for $10 a pill.  *Id.*

Two months after this controlled buy, UC-1 introduced the defendant to a second DEA

undercover agent ("UC-2") for purposes of conducting another controlled buy.  *Id.* ¶¶ 11, 12.  UC-1

gave the defendant UC-2's phone number and the defendant contacted UC-2 at that number, telling him

on November 9, 2022 to meet him in the vicinity of an Auto Zone in Oakland that was near 9848 Holly

Street.  *Id.* ¶ 13.  The defendant told UC-2 that he would bring four ounces of fentanyl, which he would

sell to UC-2 for $1,000.  *Id.*  As observed by DEA agents conducting surveillance, the defendant left the

9848 Holly Street residence on an electric scooter and went to meet UC-2.  *Id*. ¶ 15; Buszin Decl., Ex. C

¶¶ 6-7.  The defendant got in UC-2's car and sold him 112.2 grams of fentanyl for $1,000.  PSR ¶ 15.

After the transaction was complete, UC-2 asked Lopez if he could sell him eight ounces of

methamphetamine.  *Id.*  The defendant agreed and left the car to get the methamphetamine.  *Id*.  DEA

agents observed the defendant return to his residence and, approximately an hour and a half later, they

saw him exit the residence to meet with the occupants of a Honda vehicle.  Buszin Decl., Ex. C ¶ 10;

PSR ¶ 15.  The defendant returned to his residence from the car, now carrying a clear plastic bag.  PSR

¶ 15.  Soon thereafter, the defendant was observed leaving his residence to go meet UC-2 again.  Buszin Decl., Ex. C ¶ 12.  The defendant got back in UC-2's car and sold him 218.4 grams of actual methamphetamine for $1,000.  PSR ¶ 15.

On December 20, 2022, UC-2 conducted one last controlled buy with the defendant.  PSR ¶ 16. The two met again in the vicinity of the same Auto Zone in Oakland, at which point the defendant got in UC-2's car and sold him 224.1 grams of actual methamphetamine for $1,100.  *Id.*

On the morning of January 6, 2023, DEA agents executed a search warrant at the defendant's residence at 9848 Holly Street, which contained two bedrooms.  *Id.* ¶ 17.  The defendant was there, along with two other individuals, including one who was a minor.  *Id.*  In one of the bedrooms, agents found the defendant's cell phone as well as methamphetamine, fentanyl, and counterfeit oxycodone pills (M-30s).  *Id.*  Agents also searched the kitchen of the apartment, which contained an external door.  In a cabinet drawer next to the door, agents found a loaded .22 caliber revolver, two firearms that were entirely wrapped in duct tape, an Airsoft gun, a handgun magazine, and miscellaneous rounds of loose ammunition.  *Id.*  In another kitchen cabinet drawer in close proximity to the firearms, agents found methamphetamine and fentanyl.  *Id.*



**Apartment Kitchen and External Door (AL-002802)**

1
2
3
4
5
6
7
8
9
10
11
12
13
14



**Drawer with Firearms and Ammunition (AL-002803)**

15
16
17
18
19
20
21
22
23
24
25
26
27
28



**Interior View of Kitchen Drawer with Firearms (AL-002804)**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



**Kitchen with Drawer Containing Controlled Substances Circled in Red (AL-002810)**



**Interior View of Kitchen Drawer Containing Controlled Substances (AL-002811)**

1

## B.    Criminal History

2      The defendant has three prior arrests, including two for drug trafficking, which did not result in

3 any charges being filed and which are not reflected in the defendant's criminal history score under the

4 Guidelines.  PSR ¶¶ 40-42.

5      First, in January 2022—approximately six months before his first controlled buy with the

6 DEA—the defendant was arrested by BART police after he was observed selling controlled substances

7 at the Civic Center BART station in San Francisco.  *Id.* ¶ 40.  The defendant resisted arrest and, after

8 being detained, provided a false name and birthdate.  *Id.*  A search of his person revealed approximately

9 145 grams of fentanyl, along with methamphetamine, heroin, and a knife.  *Id.*  He told law enforcement

10 after his arrest that he had purchased a bag of narcotics for $1,000 that he was selling off.  *Id.*

11      Second, in August 2022—after he had completed the first two controlled buys with DEA—the

12 defendant was arrested by SFPD for possessing controlled substances for sale, again in the vicinity of

13 the Civic Center BART station.  *Id.* ¶ 41.  When officers tried to detain him, the defendant discarded a

14 bag containing approximately 26.3 grams (gross) of fentanyl, fled, and resisted arrest.  *Id.*  When he was

15 eventually detained, the defendant provided a false name and date of birth again.[1]  *Id.*  At the time of the

16 defendant's arrest, he had an active stay away order from the area, likely due to his January 2022 arrest.

17 *Id.*

18      Third, in October 2022, the defendant was pulled over by California Highway Patrol for driving

19 under the influence after he was observed driving erratically on the freeway.  *Id.* ¶ 42.  The vehicle he

20 was driving was the same red BMW that DEA agents had seen arrive at his house just before the

21 September 8, 2022 controlled buy, with one of its then-occupants coming out to bring the defendant the

22 additional methamphetamine requested by UC-1 in connection with that controlled buy.  *Id.* ¶¶ 10, 42.

23 When he was pulled over by CHP, the defendant again provided officers with his brother's name instead

24 of his own.  *Id.* ¶ 42.

25

## C.    Procedural History

26      On January 5, 2023, the Hon. Kandis A. Westmore signed a criminal complaint alleging four

27

28

---

[1] The false name that he provided was his brother's name.  *Compare* PSR ¶ 41, *with* PSR ¶ 45.

violations of 21 U.S.C. § 841(a) by the defendant.  Dkt. 1.  The defendant was arrested and had his initial appearance on January 9, 2023.  Dkt. 5.  On January 20, 2023, the defendant waived detention and he was ordered detained pending trial.  Dkt. 16.  On January 4, 2024, the government filed a seven-count Information charging the defendant with violations of 21 U.S.C. §§ 841(a)(1), (b)(1)(B)(vi), and (b)(1)(B)(viii).  Dkt. 49.  On January 5, 2024, the defendant was arraigned on the Information and waived indictment.  Dkt. 51, 52.

On February 5, 2024, the defendant pleaded guilty to all seven counts in the Information pursuant to a plea agreement.  Dkt. 57.  In the plea agreement, the parties agreed to the applicable Base Offense Level under the Guidelines; however, the parties reached no agreement as to the potential applicability of an enhancement for possession of a dangerous weapon as well as reductions for safety valve and zero-point offender.  Dkt. 57 ¶ 7.  The government agreed to recommend a sentence no higher than the range associated with a Total Offense Level two points below the Guidelines calculation set forth in the plea agreement and as further determined by the Court, so long as the defendant abided by the terms of the plea agreement and did not fail to accept responsibility.  *Id.* ¶ 16.

Sentencing is currently scheduled for April 29, 2024.  Dkt. 58.

## SENTENCING GUIDELINES CALCULATION

The parties and Probation agree that (i) the defendant's Base Offense Level is 34,[2] (ii) the defendant is entitled to a three-point reduction for acceptance of responsibility, and (iii) the defendant falls within Criminal History Category I with zero criminal history points.  The parties disagree, however, as to whether the defendant is subject to a two-point enhancement under U.S.S.G. § 2D1.1(b)(1) for possession of a dangerous weapon, as well as whether he is eligible for a two-level reduction under U.S.S.G. § 2D1.1(b)(18) (safety valve) and a further two-level reduction under U.S.S.G. § 4C1.1 (zero-point offender).

All three of these disputed issues ultimately turn on the defendant's connection to the firearms

---

[2] The Base Offense Level incorporates the converted drug weight for the fentanyl and methamphetamine sold by the defendant in each of the controlled buys giving rise to the charged offenses.  These drugs were tested by the DEA Western Lab and those test results were provided to Probation.  While the controlled substances found at the defendant's residence are not included in the converted drug weight calculation, the government does not believe this has any impact on the Base Offense Level.

1   found in his residence, though the defendant's eligibility for safety valve also depends on whether he

2   made a complete and truthful disclosure to the government regarding his criminal conduct.  For the

3   reasons stated below, the Court should apply the enhancement for possession of a dangerous weapon

4   and should find that the defendant is not a zero-point offender or eligible for safety valve.  This would

5   yield a Total Offense Level of 33 and an advisory Guidelines range of 135 – 168 months' imprisonment.

6          **A.**    **The Two-Point Enhancement Under U.S.S.G. §2D1.1(b)(1) Applies**

7          The Guidelines provide for a two-point enhancement under U.S.S.G. § 2D1.1(b)(1) "[i]f a

8   dangerous weapon (including a firearm) was possessed" as part of the defendant's relevant conduct.

9   This enhancement "reflects the increased danger of violence when drug traffickers possess weapons."

10  U.S.S.G. § 2D1.1 Appl. Note 11(A).  The Guidelines provide that the enhancement "should be applied if

11  the weapon was present, unless it is clearly improbable that the weapon was connected with the

12  offense." *Id.*  The government bears the burden of proof with respect to establishing that the weapon

13  was possessed at the time of the offense.  *United States v. Alaniz*, 69 F.4th 1124, 1126-27 (9th Cir.

14  2023).  If the government does so, the burden shifts to the defendant to establish it was "clearly

15  improbable" the weapon was connected with the offense.  *Id.*

16         In determining whether this enhancement applies, "the court need not find a *connection* between

17  the firearm and the offense.  If it finds that the defendant *possessed* the weapon during the commission

18  of the offense, the enhancement is appropriate." *United States v. Restrepo*, 884 F.2d 1294, 1296 (9th

19  Cir. 1989) (emphasis in original).  A defendant's possession of a dangerous weapon can be "actual or

20  constructive," and the Ninth Circuit does not require the weapon to be found in close proximity to drugs

21  for the enhancement to apply.  *United States v. Gomez*, 6 F.4th 992, 1008 (9th Cir. 2021).

22         "Constructive possession requires the government to prove a sufficient connection between the

23  defendant and the item to support the inference that the defendant exercised dominion and control over

24  the item." *United States v. Baldon*, 956 F.3d 1115, 1127 (9th Cir. 2020) (brackets and quotation marks

25  omitted).  Where the government is advocating for application of 2D1.1(b)(1) based solely on

26  constructive possession, the Ninth Circuit has indicated that evidence of a defendant's mere access to a

27  weapon, without more, is insufficient to establish such possession.  *United States v. Kelso*, 942 F.2d 680,

28  682 (9th Cir. 1991) (holding that the mere presence of a gun in a bag holding drugs found behind the

driver's seat of a car was insufficient to establish possession by the defendant, who was a passenger in the car).

Here, a preponderance of the evidence establishes the defendant had constructive possession of the firearms found in the kitchen of his apartment.

First, the firearms were located in a common area of the defendant's residence to which he had access, as opposed to an exclusive space (such as a bedroom) potentially associated with another occupant. *See United States v. Cazares*, 121 F.3d 1241, 1245 (9th Cir. 1997) (clear error to find defendant had constructive possession of firearms located in one of several bedrooms in a shared residence where there were no facts offered to connect the defendant to the guns or the bedroom where the guns were found).

Second, the firearms were in close proximity to fentanyl and methamphetamine, two types of drugs that the defendant had repeatedly sold to undercover DEA agents prior to the search warrant operation.  These same types of controlled substances were also found in the defendant's bedroom, which agents were able to identify as his because his cell phone was also there.  Buszin Decl., Ex. D ¶ 9. By contrast, the other bedroom in the apartment contained suspected crack cocaine and a digital scale, but no suspected fentanyl or methamphetamine.  *Id.* ¶ 11.  This consideration strengthens the "nexus or relationship" between the defendant and the items in the kitchen, which supports the inference that he had constructive possession of the items found in that room.  *Baldon*, 956 F.3d at 1127; *id.* at 1119, 1127-28 (no clear error to find defendant had constructive possession of firearm found in storage unit rented by another person, where there was evidence the defendant had entered the storage unit, stored his drugs there, paid cash to extend the lease, and possessed ammunition at his residence that corresponded to the firearm in the storage unit).

Third, the defendant's demonstrably false statements to the government and Probation regarding his connection to the apartment, as discussed further below, call into question his claim to have no association with the guns in his apartment.  *United States v. Pettway*, 2021 WL 4188716, at *2 (2d Cir. Sept. 15, 2021) (jury could infer defendant had constructive possession of drugs found in apartment where, among other things, "he lied to law enforcement about whether he had been to the apartment"); *United States v. Zwibel*, 181 F. App'x 238, 242 (3d Cir. 2006) ("[E]vidence that may establish

constructive possession includes a defendant's attempt to hide or destroy contraband, or that the defendant lied to police."); *United States v. Booker*, 436 F.3d 238, 242 (D.C. Cir. 2006) ("Although mere proximity to a gun is insufficient to establish constructive possession, evidence of some other factor—including connection with a gun, proof of motive, a gesture implying control, ***evasive conduct***, or a statement indicating involvement in an enterprise—coupled with proximity may suffice." (emphasis added)).

**B.    The Defendant Is Not Eligible for Safety Valve or a Zero-Point Offender Reduction**

**1.    The Defendant Possessed a Dangerous Weapon in Connection with the Offense**

A defendant is potentially eligible for safety valve relief only if he "did not use violence or credible threats of violence or possess a firearm or other dangerous weapon (or induce another participant to do so) in connection with the offense." 18 U.S.C. §3553(f)(2). The defendant shoulders the burden of proving by a preponderance of the evidence that he did not possess a dangerous weapon in connection with the offense. *See United States v. Ferryman*, 444 F.3d 1183, 1186 (9th Cir. 2006).

The phrase "in connection with" is not defined under either 18 U.S.C. § 3553(f) or the corresponding section of the Sentencing Guidelines.[3] *Id.*; U.S.S.G. § 5C1.2. Nevertheless, the Ninth Circuit has recognized that *conduct* resulting in an enhancement under U.S.S.G. § 2D1.1(b)(1) will ordinarily foreclose a defendant's request for safety valve. *United States v. Smith*, 175 F.3d 1147, 1149 (9th Cir. 1999) ("[E]very circuit to consider the issue has held that conduct which warrants an increase in sentence under § 2D1.1(b)(1) necessarily defeats application of the safety valve. We now align ourselves with these circuits." (citations omitted)); *see also United States v. Nelson*, 222 F.3d 545, 550 (9th Cir. 2000) ("With the *Smith* court's attention focused squarely on a defendant's conduct, its statement—that conduct which supports a § 2D1.1(b)(1) enhancement is the same as conduct which will defeat a defendant's request for safety valve relief—is entirely sensible, and each of the three cases cited by the *Smith* court do support that idea.").

---

[3] The Zero-Point Offender provision in U.S.S.G. § 4C1.1 also does not define "in connection with," however, the language of U.S.S.G. § 4C1.1(a)(3), (4) largely parallels the language in 18 U.S.C. § 3553(f)(2). *See* U.S.S.G. § 4C1.1(a)(3) (defendant eligible only if he " did not use violence or credible threats of violence in connection with the offense"); *id.* § 4C1.1(a)(7) (defendant eligible only if he " did not possess, receive, purchase, transport, transfer, sell, or otherwise dispose of a firearm or other dangerous weapon (or induce another participant to do so) in connection with the offense").

To assess whether a dangerous weapon was possessed in connection with an offense within the meaning of safety valve, district courts "conduct fact-bound and contextual inquiries, focusing on details like the circumstances in which the [weapons] were found, the implausibility of the defendants' explanations for how the [weapons] were unconnected to the drugs, or the types or quantity of weapons possessed." *United States v. Tanner*, 389 F. Supp. 3d 684, 686 (N.D. Cal. 2019) (quotation marks omitted); *accord Ferryman*, 444 F.3d at 1186-87. "Courts have described 'in connection with,' for purposes of safety valve eligibility, as involving a close connection linking the individual defendant, the weapon and the offense." *Tanner*, 389 F. Supp. 3d at 686 (quotation marks omitted). A defendant may possess a weapon in connection with a drug offense if the weapon is in proximity to drugs *or* if the weapon facilitates the drug offense, whether by emboldening an actor who had the ability to display or use the weapon, by serving as an integral part of a drug transaction as in a barter situation, by instilling confidence in others who relied on the defendant, or serving as a badge of office to help the defendant avoid detection. *Id.*

Here, the defendant cannot carry his burden of establishing that he did not possess a dangerous weapon in connection with the offense. When DEA agents searched the defendant's apartment in January 2023, they found a loaded .22 caliber revolver in a kitchen drawer next to an external door and within arm's reach of a drawer containing fentanyl and methamphetamine, the exact kinds of drugs the defendant had possessed at the apartment before repeatedly selling them to UC-1 and UC-2 in the six preceding months. *See* Relevant Background Part A, *supra*. These circumstances readily support the inference that the loaded revolver was possessed by the defendant to protect the illicit drug stash in his apartment. Based on this consideration alone, the defendant is ineligible for safety valve. *See Ferryman*, 444 F.3d at 1186; *Tanner*, 389 F. Supp. 3d at 686; *cf.* U.S.S.G. § 2K2.1 Appl. Note 14(B) (explaining that a +4 enhancement for using/possessing a firearm in connection with another felony offense applies "in the case of a drug trafficking offense in which a firearm is found in close proximity to drugs, drug-manufacturing materials, or drug paraphernalia . . . because the presence of the firearm has the potential of facilitating another felony offense").

The defendant's explanation for how the loaded revolver was purportedly unconnected to his drug trafficking activity is also self-serving, uncorroborated, and undermined by the defendant's prior conduct and statements. During his safety valve debrief, the defendant claimed he did not really use the kitchen and that

1   he had no knowledge of the firearms found there.  But, in an apparent attempt to distance himself from the

2   loaded firearm, he also claimed he had been living in the apartment for only about three weeks before the

3   search warrant was executed.  This would mean that he moved into the apartment on approximately

4   December 16, 2022, which post dates all but the last controlled buy giving rise to this case.  The defendant's

5   claim is very difficult to square with the timeline of the controlled buys.  It is also difficult to square with the

6   defendant's own recorded statements to UC-1 during the June 29 and July 21 controlled buys, where he

7   indicated to UC-1 that he lived at the Holly Street apartment.  *See* Buszin Decl., Ex. A at 9:09 – 9:35;

8   Buszin Decl., Ex. B at 11:10 – 12:30.

9   **2.   The Defendant Was Not Truthful During His Safety Valve Debrief**

10   A defendant seeking safety valve must also, by the time of sentencing, "***truthfully*** provid[e] to the

11   Government all information and evidence the defendant has concerning the offense or offenses that were part

12   of the same course of conduct or of a common scheme or plan."  18 U.S.C. §3553(f)(5) (emphasis added).

13   "[T]he fact that the defendant has no relevant or useful other information to provide or that the Government

14   is already aware of the information shall not preclude a determination by the court that the defendant has

15   complied with this requirement."  *Id.*  This provision amounts to a "tell all you can tell" requirement that

16   obligates a defendant seeking safety valve to disclose "all information at his disposal which is relevant to the

17   offense, whether or not it is relevant or useful to the government's investigation."  *United States v. Shrestha*,

18   86 F.3d 935, 939 (9th Cir. 1996).  "The phrase 'all information and evidence' is quite broad.  There is no

19   limit placed on the type of information that must be provided."  *United States v. Salazar*, 61 F.4th 723, 727

20   (9th Cir. 2023).  Such information may include "details concerning other parties to the crime, such as the

21   source who provided defendant with the drugs and other persons in the chain of distribution, if known."  *Id.*

22   The defendant has the initial burden of demonstrating by a preponderance of the evidence that he is eligible

23   for safety valve.  *Shrestha*, 86 F.3d at 940.  Once he has done so, "it falls to the Government to show that the

24   information he has supplied is untrue or incomplete."  *Id.*

25   As discussed above, the defendant was not truthful with the government regarding his connection to

26   the 9848 Holly Street apartment and the firearms found there by law enforcement.  Accordingly, he did not

27   truthfully debrief with the government, as required under § 3553(f)(5), thereby rendering him ineligible for

28   safety valve.

1

## SENTENCING RECOMMENDATION

2

### A.      Legal Standard

3

The Court should impose a sentence that is sufficient, but not greater than necessary, to reflect

4  the purposes of sentencing that Congress identified in 18 U.S.C. § 3553(a)(2).  *United States v. Carty*,

5  520 F.3d 984, 991 (9th Cir. 2008).  The Court should begin by calculating the correct sentencing range

6  under the Guidelines.  *Id.*  "The guideline range provides not only the starting point for sentencing but

7  the lodestar from which the ultimate sentence must be explained and justified."  *Galloway v. United*

8  *States*, No. 16-71939, 2016 U.S. App. LEXIS 24280, at *16 (9th Cir. Sep. 16, 2016).  After determining

9  the appropriate Guidelines calculation, the Court should then evaluate the sentence for substantive

10  reasonableness in light of the factors set out in § 3553(a).  *Carty*, 520 F.3d at 991-93.  The factors that

11  the Court must consider include:

12      (1)      The nature and circumstances of the offense and the history and characteristics of
        the defendant;

13

14      (2)      The need for the sentence imposed to reflect the seriousness of the offense, to
        promote respect for the law, and to provide just punishment for the offense;

15      (3)      The need for the sentence imposed to afford adequate deterrence to criminal
        conduct;

16

17      (4)      The need for the sentence imposed to protect the public from further crimes of the
        defendant; and

18      (5)      The need to avoid unwarranted sentence disparities among defendants with similar
        records who have been found guilty of similar conduct.

19

### B.      Sentencing Recommendation and 3553(a) Factors

20

Upon consideration of the Guidelines and the factors set forth in 18 U.S.C. § 3553(a), the United

21  States respectfully recommends that the Court sentence the defendant to a 70-month term of

22  imprisonment, to be followed by four years of supervised release subject to the standard conditions and

23  other special conditions proposed by Probation.

24

### 1.      Nature and Circumstances of the Offense

25

The nature and circumstances of the offense in this case are particularly troubling.  Here, the

26  defendant was trafficking fentanyl and methamphetamine.  The former is driving an alarming surge in

27  overdose deaths throughout the country, with the Bay Area (where the defendant was selling) acutely

28

impacted[4]:



The methamphetamine the defendant was trafficking was equally dangerous insofar as methamphetamine is a potent and highly addictive stimulant which is "the drug that most contributes to violent crime" in the United States.[5]  Furthermore, the amount of fentanyl and methamphetamine the defendant was trafficking was substantial.  The controlled buys giving rise to this case were not street-level transactions, but instead significant drug deals for thousands of dollars.

### 2.    History and Characteristics of the Defendant

The government acknowledges that the defendant's self-reported background presents several considerations that counsel in favor of a downward variance below the Guidelines, as the government is recommending here.  These considerations include his impoverished upbringing, his limited education, and his acceptance of responsibility with respect to the charged offenses.

However, these factors must be balanced against other aspects of the defendant's background, such as his criminal history.  As reflected in the PSR, the defendant was arrested three times in 2022—

---

[4] *See* Yoohun Jung, *61 People Died in March in San Francisco from Accidental Overdoses*, S.F. Chron. (last updated Mar. 12, 2024), *available at* https://www.sfchronicle.com/projects/san-francisco-drug-overdose-deaths/.

[5] National Institute on Drug Abuse, *Methamphetamine Research Report* (Oct. 2019), *available at* https://nida.nih.gov/publications/research-reports/methamphetamine/overview.

twice for drug trafficking offenses where the defendant tried to flee and provided the police with false identifiers, and once for driving under the influence at a high rate of speed on the freeway.  PSR ¶¶ 40-42.  Although the defendant's criminal history is not lengthy, it is notable that none of the three incidents referenced above resulted in any criminal history points, suggesting that the defendant's criminal history score under the Guidelines understates his criminal history.  Furthermore, the defendant's drug-trafficking activity did not begin with his first sale of fentanyl to the DEA.  As the defendant acknowledged during his safety valve debrief, he began selling controlled substances about 3-5 months after he turned 18 years old in July 2021, meaning that he was selling drugs for approximately one year (December 2021 – January 2023) before he was arrested and detained in connection with this case.

### 3. The Need for the Sentence to Afford Adequate Deterrence, Protect the Public from Future Crimes of the Defendant, and Promote Respect for the Law

A significant sentence is also warranted to afford adequate deterrence, promote respect for the law, and protect the public from future crimes.  Studies by the United States Sentencing Commission have found that defendants sentenced to more than five years in prison are much less likely to reoffend.[6]  By contrast, the Commission found no statistically significant differences in recidivism rates for those who were sentenced to five years or less in custody.[7]  Sentencing Commission studies have also found higher rates of recidivism among young federal offenders who were convicted of drug trafficking offenses, a demographic group in which the defendant falls.[8]  While the overall rearrest rate for drug trafficking offenders was similar to the rearrest rate for all other offenders, the Commission found significant differences in rearrest rates for drug trafficking offenders based on their age at the time of release.  For example, while the rearrest rate was less than 31% for offenders 50 or older at the time of release, the rearrest rate was 59.3% for offenders aged 21-29 at the time of release and 70.1% for offenders younger than 21 at the time of release.  In light of these considerations, the need to deter the

---

[6] United States Sentencing Commission, *Length of Incarceration and Recidivism* 4 (June 2022), *available at* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2022/20220621_Recidivsm-SentLength.pdf.

[7] *Id.*

[8] United States Sentencing Commission, *Recidivism of Federal Drug Trafficking Offenders Released in 2010* 5-6 (Jan. 2022), *available at* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2022/20220112_Recidivism-Drugs.pdf.

UNITED STATES' SENTENCING MEM.

1    defendant from reoffending, as well as the need to protect the public from the significant chance that he

2    might, support the 70-month sentence recommended by the government.

3            Considerations of general deterrence also counsel in favor of such a sentence, particularly given

4    the explosion in recent years in fentanyl and methamphetamine trafficking and use, which have

5    significant impacts on the community.  *Cf. United States v. McBriarty*, 2021 WL 1648479, at *9 (D.

6    Conn. Apr. 27, 2021) (denying motion to reduce 10-year sentence for trafficking fentanyl based on

7    principles of general deterrence given the "drug overdose crisis" and surge in accidental overdose deaths

8    involving fentanyl); *United States v. Marshall*, 2020 WL 5369038, at *3 (E.D. Mich. Sept. 8, 2020)

9    (denying motion for compassionate release because granting the motion "would not be consistent with

10   the goal of deterrence" set forth in 18 U.S.C. § 3553(a)(2)(B) "given the increasing rates of fentanyl

11   sales and overdoses").

12            **4.      Avoiding Unwarranted Sentencing Disparities**

13            According to the Judiciary Sentencing Information (JSIN), the average and median sentences

14   imposed in the last five fiscal years with respect to defendants who had a Guidelines range identical to

15   the one the government is advocating for here were 101 months and 108 months, respectively.[9]  A

16   sentence below this level is warranted here based on the mitigating considerations noted above.

17   Accordingly, the government has recommended a sentence about three years less than what others

18   similarly situated to the defendant have received, as reflected in the JSIN data.  However, a further

19   variance below the 70 months recommended by the government would present a significant sentencing

20   disparity between the defendant and others convicted of similar conduct, and would not be supported by

21   the record here.

22                                    **CONCLUSION**

23            For the reasons stated above and in consideration of all the evidence presented in the record, the

24   government respectfully requests that the court impose a sentence of 70 months in custody, to be

25   followed by four years of supervised release subject to the conditions proposed by Probation.

26   //

27            ───────────────
          [9] This is based on a search of the JSIN data for defendants whose primary Guideline provision
28   was 2D1.1 with fentanyl as the primary drug type, and who had a Total Offense Level of 33 and were in
     Criminal History Category I.

1    //

2    DATED:  April 22, 2024                          Respectfully submitted,

3                                                    ISMAIL J. RAMSEY
                                                     United States Attorney
4

5                                                    _____/S/_____

6                                                    JARED S. BUSZIN
                                                     Assistant United States Attorney
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28