Matthew Dirkes (State Bar No. 255215)
ILLOVSKY & CALIA LLP
matt@illovskycalia.com
1611 Telegraph Ave., Ste. 806
Oakland, CA 94612
Telephone: (415) 500-6640

Attorney for Defendant
Alejandro Lopez

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　　Plaintiff,<br><br>　v.<br><br>ALEJANDRO LOPEZ,<br><br>　　　　　　Defendant. | Case No. 24-cr-00003-AMO<br><br>**SENTENCING MEMORANDUM OF ALEJANDRO LOPEZ**<br><br>Court:　Hon. Araceli Martínez-Olguín<br>Date:　April 30, 2024<br>Time:　2:00 p.m. |

Alejandro Lopez submits this memorandum for the Court's consideration in connection with his upcoming sentencing. He appreciates and agrees with the Probation Office's recognition that a downward variance is warranted. Presentence Investigation Report (PSR), ECF No. 60, ¶ 89 & Sentencing Recommendation at 2.

Mr. Lopez grew up fatherless and in poverty in Honduras. His small village lacked electricity or running water. He obtained the equivalent of an eighth-grade education and then, as a 14-year-old, became addicted to cocaine after the grandfather who had raised him died. Like so many others, he then fled the poverty and instability of his country for the possibility of economic stability here. That dream soured within months of his arrival when purported friends convinced him he was better off selling drugs than trying to find honest work. His stint in the drug trade was short-lived. In his plea agreement, he has admitted to engaging in five street-level drug sales, all of which were requested and arranged by undercover government agents. At the time of the offense conduct, Mr. Lopez was only 19 years old. Aside from the present case, he has incurred no other criminal convictions.

For the reasons set forth below, Mr. Lopez respectfully requests that the Court find him eligible for safety valve relief and impose a sentence of two years. Such a sentence is sufficient and no greater than necessary to serve the interests of society and justice, especially given that Mr. Lopez will be deported back to Honduras upon the completion of his sentence.

## I.   MR. LOPEZ IS ELIGIBLE FOR SAFETY VALVE RELIEF

Safety valve reflects the legislative judgment that low-level offenders whose "knowledge may be of little or no use to the government" should not be barred from relief from mandatory minimum sentences. *United States v. Shrestha*, 86 F.3d 935, 938-39 (9th Cir. 1996). The Court has broad authority to determine whether Mr. Lopez is eligible for safety valve relief. *United States v. Ferryman*, 444 F.3d 1183, 1186 (9th Cir. 2006). Even where the government opposes safety valve, a district court has "broad discretion to find safety valve eligibility in spite of government opposition . . . ." *United States v. Matos*, 328 F.3d 34, 42 (1st Cir. 2003) (citations omitted).

A defendant is eligible for safety valve relief if he satisfies the following criteria: (1) he does not have more than one criminal history point; (2) he did not use violence or possess a firearm "in connection with the offense;" (3) the offense did not result in death or serious bodily injury; (4) the

defendant was not an organizer, leader, manager, or supervisor of others; and (5) the defendant truthfully provided the government all information and evidence he has concerning the offense. 18 U.S.C. § 3553(f); U.S.S.G. §5C1.2(a).

The only dispute regarding Mr. Lopez's eligibility for safety valve is whether he possessed firearms (no. 2) and whether his statements to the government denying that he was even aware of the firearms were truthful (no. 5).

Although the burden of proof for safety valve lies with the defendant, "to qualify for relief the defendant must only prove by a preponderance of the evidence that a weapon was not used in connection with the offense." *United States v. Nelson*, 222 F.3d 545, 550 (9th Cir. 2000).

In the Information, Mr. Lopez was charged with possession arising out of five transactions with an undercover agent that occurred in June, July, September, November, and December 2022, respectively. ECF No. 49. The government arrested Mr. Lopez early in the morning in January 2023 and executed a search warrant at a house where he had been living. PSR ¶ 17. At least two other individuals were also living in the house at the time and were also detained that morning. *Id.* Agents found drugs in the kitchen. *Id.* They also found three handguns in a closed drawer in the kitchen. Two of the handguns were completely wrapped in duct tape. *Id.* The third was a single-action .22 revolver, essentially a six-shooter of the type one might see in old Westerns and hardly the type of large-caliber semiautomatic Glock or ghost gun one typically associates with the drug trade. Although agents also located drugs in a bedroom of the house where they located Mr. Lopez's cell phone, there were no firearms in that bedroom. *Id.*

In light of those undisputed facts, there is no way to conclude that Mr. Lopez was even aware of the guns, let alone that he possessed them "in connection with the offense." 18 U.S.C. § 3553(f)(2).

To begin, the guns were found at the residence in January 2023. The offense conduct, however, occurred months earlier. Of the five sales to the undercover agent charged in the Information and admitted in the plea agreement, three happened near the residence where the guns were found. But those sales occurred in June, July and September 2022. Plea Agreement, ECF No. 57, ¶¶ 2(a), (b), (c). The government has offered no evidence at all that the guns found in the

1  residence during the search in January 2023 were at the house in June, July, or September 2022,
2  when the sales occurred near the residence.
3      The two other sales to the undercover agent happened in an Auto Zone parking lot. *Id.* ¶¶
4  2(d), (e). No evidence suggests that Mr. Lopez was armed with the guns found in the house (or any
5  other guns) when he traveled to the Auto Zone parking lot in November and December of 2022.
6  Notably, Mr. Lopez was not charged with anything arising out of the January 2023 search of the
7  residence. Information, ECF No. 49. This, by itself, precludes a finding that the guns were possessed
8  "in connection with the offense."
9      Even if that were not enough, the circumstances under which the guns were found would
10 preclude a determination that Mr. Lopez possessed them in connection with the transactions in 2022.
11 The guns were in a closed drawer in a room that did not otherwise contain indicia of Mr. Lopez's
12 presence. At least two other individuals lived in the house. The government has provided no
13 evidence to suggest that the guns did not belong to one of them. No DNA or fingerprint evidence
14 from the guns connects them to Mr. Lopez. No guns were found in the room in which he was living.
15 No other individuals told the government that the guns belonged to Mr. Lopez. Nothing in the
16 hundreds of pages of discovery provided by the government suggests Mr. Lopez ever carried, used,
17 or even touched a gun in connection with the drug transactions at issue.
18      Given all of the foregoing, there is nothing to suggest the type of "active possession"
19 involving "a close connection linking the individual defendant, the weapon and the offense" that is
20 necessary to preclude safety valve eligibility. *United States v. Zavalza-Rodriguez*, 379 F.3d 1182,
21 1187 (10th Cir. 2004); *see also In re Sealed Case (Sentencing Guidelines "Safety Valve")*, 105 F.3d
22 1460, 1463 (D.C. Cir. 1997) (recognizing that "[a]lthough the defendant's proximity to the
23 contraband is relevant to his ability to exercise dominion and control over the contraband,"
24 "establishing dominion and control requires more than just proximity"; "[t]here must be some action,
25 some word, or some conduct that links the individual to the contraband and indicates that he had
26 some stake in it, some power over it." (internal quotation marks and alterations omitted)).
27      The government instead asks the Court to simply assume that because the guns were located
28 in the same house where Mr. Lopez was living in January 2023, the guns must have been at the house

in June, July, and September of 2022 and that Mr. Lopez must have known about and used them in connection with those sales. The Court should decline to make that leap of logic given the absence of any evidence to support it. *Compare United States v. Ajugwo*, 82 F.3d 925 (9th Cir. 1996) (denial of safety valve proper where debrief statements of co-defendants contradicted defendant's account).

When Mr. Lopez spoke with the government, he denied knowledge or possession of the guns. That statement was truthful. The Court should conclude that Mr. Lopez is safety-valve eligible and grant him the accompanying two-level reduction in his adjusted offense level. Absent safety-valve relief, Mr. Lopez faces a mandatory minimum sentence of five years, despite the fact that he has a criminal history score of zero and committed the offenses when he was 19 years old.

## II.     THE GUIDELINES CALCULATION

Everyone agrees on a base offense level of 34 and a three-level reduction for acceptance. PSR ¶¶ 25, 31, 32; Plea Agreement, ECF No. 57, ¶ 7.

The Court should decline to add a two-level increase under U.S.S.G. §2D1.1(b)(1) for possessing a gun. Unlike the burden of proof for safety valve possession, discussed above, the government has the burden of proof under §2D1.1(b)(1) to show by a preponderance of the evidence that Mr. Lopez possessed a gun. *United States v. Nelson*, 222 F.3d 545, 550-51 (9th Cir. 2000). For all of the reasons discussed above, the government cannot satisfy that burden. *United States v. Alaniz*, 69 F.4th 1124, 1126 (9th Cir. 2023) (§2D1.1(b)(1)'s two level increase applies if a firearm "was possessed and *present during the crime*") (emphasis added, internal quotation marks omitted).

Mr. Lopez agrees with the Probation Office that he is entitled to a two-level reduction given that his a Zero-Point Offender under U.S.S.G. §4C1.1(a)(1). PSR ¶ 33. As such, Mr. Lopez believes the correct guidelines calculation is as follows:

| | |
|---|---|
| Base Offense Level: | 34 |
| Acceptance: | -3 |
| Safety Valve | -2 |
| <u>Zero Point Offender:</u> | <u>-2</u> |
| Total Offense Level: | 27 |

A level 27 with a criminal history score of zero yields a guideline range of 70-87 months.

4                                      SENTENCING MEMORANDUM
                                         Case No.: 24-cr-00003-AMO

In the plea agreement, the government has agreed to recommend a sentence within the guidelines range "associated with the Total Offense Level that is two levels below" the final guideline range found by the Court. Plea Agreement, ECF No. 57, ¶ 16. As such, the government agrees to recommend a sentence in the range of 57-71 months, which corresponds to a total offense level of 25.

### III.    HISTORY AND CHARACTERISTICS OF MR. LOPEZ

Mr. Lopez grew up in poverty in Honduras. PSR ¶ 46. According to the World Bank, Honduras "remains one of the poorest and most unequal countries in the region."[1] About half of the population lives below the poverty line.[2] The BBC reports that "Honduras has a long history of military rule, corruption, poverty and crime which have left it one of the least developed and most unstable countries in Central America."[3] The small village in which Mr. Lopez was raised lacked electricity and running water. PSR ¶ 47. His house was made of clay and the rooms were separated by only a sheet. *Id.* His brother confirms that they grew in in "extreme poverty." PSR ¶ 52.

Mr. Lopez never knew his father, though he learned that while his mother was pregnant with him his father stabbed her in the stomach in an effort to terminate the pregnancy. PSR ¶ 47. When he was just six months old, his mother left to find work in the city, leaving him to be raised by his grandparents. *Id.*

When he was thirteen, his grandfather died from cancer. PSR ¶ 48. They had been "significantly close" and, as a primary source of emotional and financial stability and as the only father-like figure in Mr. Lopez's life, the loss of his grandfather was especially difficult. *Id.* By the time he was 14, to cope with the ensuing depression and hopelessness, he was using marijuana and cocaine on a daily basis. PSR ¶ 56. The constant drug use during those formative years almost certainly impacted his cognitive development, which was further hampered by the lack of any educational opportunities past the eighth grade. PSR ¶ 58.

---

[1] https://www.worldbank.org/en/country/honduras/overview (last visited Jan. 21. 2024)

[2] *Id.*

[3] https://www.bbc.com/news/world-latin-america-18954311 (last visited Jan. 21, 2024)

When he was 17 years old, his mother married an abusive partner. PSR ¶ 49. Shortly thereafter, despite the guilt of leaving behind his younger sister, who suffers from Down Syndrome and who Mr. Lopez describes as "the brightest star in my life," Mr. Lopez left for the United States seeking economic opportunity. PSR ¶¶ 49, 50.

His trip here aboard "La Bestia" through Mexico was perilous. He was robbed at knifepoint and forced to beg for food and money to continue the journey. PSR ¶ 50. He witnessed another passenger die after she was knocked off the moving train. *Id.* Eventually, he reached Texas and submitted to immigration authorities. *Id.* He remained in immigration custody for several months until his uncle obtained his release and brought him to Oakland. *Id.*

Once in Oakland, he lived with his uncle for several months. *Id.* He enrolled in Fremont High School and worked with his uncle in construction, earning $700 a week. PSR ¶ 59. But high school was difficult as Mr. Lopez did not speak or understand English. PSR ¶ 58. He instead fell in with a group of peers that encouraged him to leave school and join them in the Tenderloin, where they introduced him to the drug trade. PSR ¶ 50. He became homeless for a period of time as he could no longer live with his uncle and he lacked the necessary funds to afford rent elsewhere. *Id.*

### IV.  NATURE OF THE OFFENSE

Over the course of six months in 2022, Mr. Lopez has admitted to acting as a street-level dealer and engaging in five drug transactions. Each transaction was requested and arranged by the Drug Enforcement Agency through an undercover agent. The DEA also established the quantity of drugs exchanged. *See* PSR ¶ 6 (DEA arranges to purchase eight ounces of fentanyl in June 2022); PSR ¶¶ 7, 8 (undercover agent requested eight ounces of fentanyl and four ounces of methamphetamine for the July 2022 transaction, and then increased the requested amount of methamphetamine to five ounces); PSR ¶ 10 (for the September 2022 transaction, undercover agent initially requested six ounces of fentanyl and four ounces of methamphetamine, then asked to increase the amount of methamphetamine to eight ounces, and also requested counterfeit oxycodone pills); PSR ¶¶ 12, 15 (undercover agent requested four ounces of fentanyl in November 2022 and then during the transaction also requested eight ounces of methamphetamine); PSR ¶ 16 (December 2022 sale involved approximately eight ounces of methamphetamine).

The June, July, and September transactions occurred near a residence on Holly Street in Oakland and the November and December transactions occurred in the parking lot of an Auto Zone. PSR ¶¶ 9, 10, 13, 16.

## V.    A SUFFICIENT AND FAIR SENTENCE

A sentence must be "not greater than necessary" to "provide just punishment," deter criminal behavior, and protect society.  18 U.S.C. § 3553(a).  A below-guidelines sentence of two years' incarceration would provide just punishment in this case.

We agree with the Probation Office that a downward variance is appropriate given the nature and circumstances of Lopez's life.  As noted in the PSR, the Court may consider Mr. Lopez's youth, his lack of educational opportunity, the poverty in which he was raised, and the trauma he's experienced.  PSR, Sentencing Recommendation, at 2.  The Court may also take into account Mr. Lopez's struggles with addiction and substance abuse driven by the trauma he experienced throughout his childhood.  *Id.*

As to the statutory factors, two years in prison will, without any doubt, punish Mr. Lopez. We believe it also will deter future criminal conduct, especially given that Mr. Lopez will be deported back to Honduras upon the completion of his sentence.  A longer sentence would not increase deterrence.

The Department of Justice itself has reached that same conclusion.  The National Institute of Justice, the research, development and evaluation agency of the Department of Justice, concluded in 2016 that "the chance of being caught is a vastly more effective deterrent than even draconian punishment."[4]  "[P]rison sentences (particularly long sentences) are unlikely to deter future crime."[5] In fact, prison sentences may actually lead to increased future criminal behavior:  "Persons who are incarcerated learn more effective crime strategies from each other, and time spent in prison may desensitize many to the threat of future imprisonment."[6]  A sentence longer than two years would not

---

[4] https://nij.ojp.gov/topics/articles/five-things-about-deterrence (last visited July 3, 2023).

[5] *Id.*

[6] *Id.*

add any additional deterrence or reduce the risk of recidivism. For the same reasons, and because Mr. Lopez faces deportation after his sentence, a longer sentence would not better protect the public.

We also note that Mr. Lopez's sentencing guidelines are driven by drug quantity. *See* PSR ¶ 25. Those quantities, in turn, are the result of the government's decision to set up five separate controlled buys from Mr. Lopez. As noted above, the quantity of drugs during each transaction was requested by the DEA. The DEA could have arrested Mr. Lopez after the first transaction in June 2022. The drug quantity from that transaction alone – 240 grams of fentanyl, Plea Agreement, ECF No. 57, ¶ 2(a) – would have exposed Mr. Lopez to a lengthy sentence. U.S.S.G. §2D1.1(c)(7) (base offense level 26 yielding range of 63-78 months). The government, however, saw fit to set up four more transactions. Those transactions, as far as undersigned counsel can discern, had no impact other than to significantly increase Mr. Lopez's potential sentencing exposure, including triggering a five-year mandatory minimum sentence unless the Mr. Lopez satisfies the safety valve criteria. *Cf. United States v. Black*, 733 F.3d 294, 310 (9th Cir. 2013) (recognizing situation where government pressures defendant to sell more drugs than he otherwise would for the purpose of increasing a sentence).

Finally, in crafting an appropriate sentence, the Court should consider Mr. Lopez's young age at the time of the transactions. As the Supreme Court has noted, the differences between juvenile and adult offenders include "[a] lack of maturity and an underdeveloped sense of responsibility [that] often result in impetuous and ill-considered actions and decisions." *Roper v. Simmons*, 543 U.S. 551, 569 (2005). That characteristic suggests that "juvenile offenders cannot reliably be classified among the worst offenders." *Id*. Moreover, "juveniles are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure," which, again, means that "their irresponsible conduct is not as morally reprehensible as that of an adult." *Id.* at 569-70 (internal quotation marks omitted).

Mr. Lopez was 19 when he committed the instant offenses. A scientific consensus now exists that emerging adulthood – ages 18 to 25 – is a period of life distinct from both adolescence and adulthood. Gibbons & Ashdown, A Review of Emerging Adults in America: Coming of Age in the 21st Century, 51 PsycCRITIQUES 3, 3 (2012) ("The introduction of the concept of emerging adulthood is arguably the most important theoretical contribution to developmental psychology in the

past 10 years and has spawned a great deal of research."); Nat'l Academies of Science, Engineering, and Medicine et al., The Promise of Adolescence: Realizing Opportunity for All Youth (2019) at 273 ("[T]he latest adolescent brain development research shows that the developmental period from adolescence through emerging adulthood features the creation of new neural pathways and the enhancement of connections between brain systems and neural networks."). The scientific community agrees that the human brain does not reach full maturation until at least age 25, when an emerging adult becomes fully developed. *Id.* at 296 ("although adolescents may develop some adult-like cognitive abilities by late adolescence (roughly age 16), the cognitive control capacities needed for inhibiting risk-taking behaviors continue to develop through young adulthood (age 25)").

As a result, risky behavior peaks not during adolescence but emerging adulthood. Scott et al., Young Adulthood as a Transitional Legal Category: Science, Social Change, and Justice Policy, 85 Ford. L. Rev. 641, 644 (2016); Steinberg *et al*., Age Differences in Future Orientation and Delay Discounting, 80 Child Dev. 28, 35 (2009). Research reveals that criminal behavior decreases persistently after age 25. U.S. Sent'g Comm'n, The Effects of Aging on Recidivism Among Federal Offenders (Dec. 2017), https://bit.ly/3DMG4bk (re-incarceration rate highest for individuals release before age 25). This timeline correlates with research on when brain development is complete, rendering individuals less prone to immature behavior. Monahan et al., Psychosocial (Im)maturity From Adolescence to Early Adulthood: Distinguishing Between Adolescence Limited and Persisting Antisocial Behavior, 25 Dev. & Psychopathology 1093, 1093–1105 (2013).

The Supreme Court has described the "hallmark features" of youth that render young offenders categorically less culpable than fully mature offenders: "immaturity, impetuosity, and failure to appreciate risks and consequences . . . [the inability to] extricate [one]self [from a] brutal or dysfunctional [home environment] . . . [susceptibility to] familial and peer pressures . . . [and amenability to] rehabilitation . . . ." *Miller v. Alabama*, 567 U.S. 460, 477 (2012).

Mr. Lopez exhibited all of those "hallmark features." The presence of those features – immaturity, impetuosity, failure to appreciate risks and consequences, susceptibility to peer pressure, and inability to control his environment – suggests he is less culpable than fully mature offenders. *Id.* at 471 (juveniles "are more vulnerable . . . to negative influences and outside pressures including

from their family and peers; they have limited contro[l] over their own environment and lack the ability to extricate themselves from horrific, crime-producing settings.").

## CONCLUSION

For the reasons stated, Alejandro Lopez respectfully suggests that a sentence of two years' incarceration is sufficient and no greater than necessary to impose just punishment in this case.

Dated: April 22, 2024

ILLOVSKY & CALIA LLP

\_/s/Matthew Dirkes_____
Matthew Dirkes

Attorney for Alejandro Lopez